THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* NEIL A. VARNEY, Defendant-Appellant.

Second District   No. 76-427

Opinion filed March 1, 1978.—Rehearing denied April 7, 1978.

Alex Rafferty, III, of Finn, Geiger & Rafferty, of Waukegan, for appellant.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and Robert J. Anderson, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE BOYLE delivered the opinion of the court:

After a jury trial, Neil Varney, hereinafter the defendant, was convicted of murder and sentenced to a term of 50-99 years. On appeal the defendant contends that his statements to the police and State's Attorney should not have been admitted as evidence because the defendant did not waive his right to have counsel present at his interrogation. Paramount to our disposition of this issue, however, is at what point in time did the defendant have the right to counsel either because he was in custody or because the investigatory process had focused on him. This issue was not reached by either counsel in his brief, but we deem it to be imperative to our resolution of this appeal.

■■ After a review of the record, we have determined that the defendant was not in custody at the private polygraph examiner's office and was not entitled to *Miranda* warnings at this stage. We further find that once the defendant was in custody at the sheriff's office, he voluntarily waived his right to have counsel present prior to his inculpatory statements, and that the trial court properly found that the defendant's statements were voluntarily made after "the defendant adequately knew, and was aware of his rights" and. denied the defendant's motion to suppress his confession.

Except for slight discrepancies in the defendant's testimony at the hearing on the motion to suppress, the facts are not in dispute.

On August 2, 1974, Jean Hendricks, the deceased, was found murdered in her yard outside of her home in Lake Villa, Illinois. She had been

brutally beaten and raped and had been last seen at the Kennedy Tavern, which is approximately 200 yards from her house.

At the hearing on the defendant's motion to suppress, Detective James A. Hessian gave the following testimony. He testified he met Neil Varney, the defendant, on August 5, 1974, at the Libertyville Police Station in a conference room with three other plainclothes detectives. The defendant voluntarily met the officers there and was not handcuffed or in custody. The defendant told the officers that he was at the tavern on the night in question and had seen the deceased talking to Joe Morgan, a mustachioed fellow in his 30's, prior to her leaving the tavern. The defendant also claimed to have heard this individual remark, "I like older women," which is relevant because the deceased was in her 40's. The defendant also stated that he had seen the deceased leave the tavern but that she had left her purse behind. Shortly thereafter, the defendant stated, the mustachioed man was not at his stool and was absent for 15 minutes. The defendant also admitted that he had left the tavern for approximately 15-30 minutes after the deceased had left because he discovered he had lost the keys to his pickup truck. The defendant then said he took a flashlight and went out and looked for the keys for approximately 15-20 minutes and found the keys on the ground near the left front door. Detective Hessian testified that Sergeant Thomas S. Brown brought up the subject of a polygraph examination to the defendant and informed him that it was wholly voluntary on his part. The defendant indicated that he would be willing to take the examination, and the conversation with the defendant ended at this time and he went back to work. Detective Hessian called an independent polygraph examiner, Charles E. Larson, on August 6, 1974, and set up a polygraph examination for the defendant for Wednesday morning, August 7, 1974, at 10 o'clock. Detective Hessian, accompanied by Corporal Lewis J. Harceg, then went to the place of the defendant's employment in civilian clothes to tell the defendant that an appointment had been made for him at 10 a.m. and that the examination was completely voluntary. Detective Hessian told the defendant that the polygraph examiner's office was located in the Karcher Hotel and that he would meet him in the lobby there at 10 a.m. Detective Hessian met the defendant the next morning in the lobby of the hotel and accompanied him up to Charles E. Larson's office on the second floor. Detective Hessian then testified that he left and went back to the sheriff's office where, at 10:30 a.m., Larson called and told him to "come on over." Upon his arrival, Hessian testified that Larson was in the process of calling attorney Thomas Stepanich into his office where Larson and Stepanich conferred. Thereupon attorney Stepanich went into Larson's private office and talked in private to the defendant for approximately 15-20 minutes. Attorney Stepanich came out and told Larson, "I've told him

what every attorney is obliged to tell his client," and then went into his own office. Detective Hessian, with Corporal Harceg—who had since joined Hessian at Larson's office—inquired of the defendant if he had hired Mr. Stepanich as his lawyer. The defendant said, "No," and stated that Mr. Stepanich had "told me the spot I'm in. He told me what my rights were in this matter." Detective Hessian then stated, "Well, after talking to Mr. Stepanich, do you still wish to talk to us?" The defendant said, "Yes, I'll talk with you." The defendant was then read his *Miranda* rights by Corporal Harceg, and the defendant also signed a form which stated that he had been notified of his rights and which was witnessed by both Corporal Harceg and Detective Hessian. Detective Hessian then questioned the defendant concerning an admission he had made to Larson that he had seen the deceased when he had gone outside to look for his truck keys and, in fact, had walked her partially home. The detectives continued to talk to the defendant, and Detective Hessian stated, "Pretty soon he was in the driveway with her, and there he maintained he had left her, and as he proceeded to walk back to the tavern he heard what sounded like someone somersaulting in the bushes there. And he again, he thought he heard a cry for help, but that he didn't go to investigate it." At this juncture, the detectives thought they were imposing on Mr. Larson by tying up his office for approximately an hour, and they asked the defendant if he would accompany them to the sheriff's office, which was across the street. It was approximately 12:30 p.m., and the officers had been talking to the defendant for approximately an hour.

At the sheriff's office Detective Hessian and Corporal Harceg continued to go over the defendant's story until approximately 1 p.m. At this time, Sergeant Fred Zeason was briefed as to what had transpired so far in their conversations with the defendant. Sergeant Zeason inquired of the defendant if he had been advised of his rights, and the defendant responded in the affirmative. Sergeant Zeason was also shown that the defendant had signed a notification of rights form. He then said to the defendant, "Neil, if you are involved in this, now is the time to tell us about it." Sergeant Zeason testified that the defendant had his head down, started to sob, and said, "I did it, I beat her." At this time, Sergeant Zeason stopped the questioning and asked the defendant if he would go to the State's Attorney's office and make a statement, to which the defendant responded, "I will." Sergeant Zeason stated that the defendant was not in handcuffs at the time, he was neither threatened nor induced, and he never requested either to see an attorney or to make a telephone call to anyone.

The defendant was then taken to see assistant Lake County State's Attorney Michael Cummins, whose office was in the same building. At Cummins' office, Detective Harceg testified that Mr. Cummins advised

the defendant of his rights and the defendant related the events of August 2 as to how he had forced intercourse upon the deceased and all of a sudden had commenced to beat her. The defendant agreed to give a written statement to this effect but changed his mind when a stenographer came in, and he asked to speak to an attorney.

Detective Harceg testified that the defendant was originally interviewed because on the night in question he was checking I.D. cards at the tavern and the police thought he could supply the names of people in the tavern. He further testified that the defendant was not in handcuffs, nor was he threatened at any time on the 5th, 6th or 7th of August. He also stated that when the defendant asked him upon leaving Larson's office if they were going to handcuff him, the detective answered, "No, we are not going to handcuff you. We have no reason to."

Charles Larson, a self-employed polygraph operator who was retired after 27 years with the sheriff's office of Lake County, testified that prior to meeting the defendant he was not supplied with any police reports. He stated that he told the defendant that the test was voluntary and that he did not have to take it and no one could force him to take it. Prior to the polygraph examination, Larson asked the defendant about his activities and observations on the night of August 2, 1974, so that he could obtain the necessary background for the polygraph examination. During the course of this background discussion the defendant disclosed that he had seen the deceased outside the tavern and did, in fact, walk her to the edge of her driveway. At this point, Mr. Larson thought he might be approaching a sensitive area of questioning and asked the defendant if he wished to speak to an attorney. Mr. Larson then read the defendant his rights and told him if he could not afford an attorney the court would appoint one for him. The defendant requested to see an attorney, and at that point Mr. Larson brought Mr. Stepanich into the office. Mr. Larson also testified that Detective Hessian, when he initially called, had told him that there were two people on whom he wanted to run a polygraph with reference to a murder at Gages Lake. Larson testified that Detective Hessian explained to him that both of these individuals had been in the Kennedy Tavern on the night of August 2 and may possibly have had some contact with the murder victim, and the officers wished to ascertain who was telling the truth.

The defendant testified that at no time prior to his statements was he in custody, restricted in his movements or handcuffed. His testimony differed from the officers' only in that he stated that they told him on August 6 if he did not take the polygraph examination they would find out why, that when the officers first talked to him in the polygraph office he did not answer their questions, and that at the sheriff's office the officers denied his request to call Jim French, a friend who knew some attorneys.

As we noted in *People v. Zynda* (1977), 53 Ill. App. 3d 794, 368 N.E.2d 1079, the credibility and weight to be given the conflicting testimony of the officers and defendant is a factual determination to be made by the trial court. In denying the defendant's motion to suppress, the trial court obviously accorded greater weight to the officers' testimony. This finding is clearly supported by the factual consistencies in the officers' testimony.

The question before us is at what point in time was the defendant subject to custodial interrogation. We will examine this question in relation to two different intervals wherein the defendant was subject to questioning: (1) by Larson at his office prior to the arrival of Officer Hessian and Corporal Harceg, and (2) by Officer Hessian and Corporal Harceg at Larson's office.

■■ The defendant in this cause was entitled to receive his *Miranda* warnings only when he was subject to "custodial interrogation * * * initiated by *law enforcement officers* after * * * [he] ha[d] been taken into custody or otherwise deprived of his freedom of action in any significant way." (Emphasis added.) (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602.) As the Supreme Court recently noted in *Beckwith v. United States* (1976), 425 U.S. 341, 346-47, 48 L. Ed. 2d 1, 7-8, 96 S. Ct. 1612, 1616, the *Miranda* decision:

> "* * * was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of * * * in-custody interrogation,' [citation]."

For:

> " ' "It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the Miranda requirements with regard to custodial inter-rogation." ' "

First, it is obvious that at all times prior to his arrival at the polygraph examiner's office, the defendant's actions were wholly voluntary. He was never arrested nor placed under any restraint at any time prior to his arrival at Mr. Larson's office on August 7. In addition, the questioning did not shift from the investigatory to the accusatory stage prior to his arrival at the polygraph examiner's office. On the contrary, the defendant, prior to his arrival at Larson's office, had "focused" the investigation on another individual—Joe Morgan—who, the defendant had told the officers, had talked to the deceased that evening at the tavern, who had left the tavern shortly after the deceased, and whom the defendant had overheard express a dubious preference for older women. Thus, the defendant was not subject to custodial interrogation at the time he arrived at the polygraph office. Further, the defendant's freedom of action had not been restricted at the polygraph office since he had arrived there voluntarily

and at no time had been placed under arrest nor had been the focus of the investigation. Under these circumstances of noncustodial interrogation, the defendant was not entitled to *Miranda* warnings from Mr. Larson. (*People v. Davenport* (1977), 49 Ill. App. 3d 130, 363 N.E.2d 1200; *People v. Sleezer* (1977), 47 Ill. App. 3d 969, 362 N.E.2d 1071.) The fact that Mr. Larson took it upon himself as a private individual to ask the defendant if he wanted to talk to an attorney is immaterial, because at this time the defendant was *not* the focus for *Miranda* purposes. He was not being questioned by a law enforcement *official*, nor *in custody*, nor deprived of his freedom of action in any significant way, nor was the polygraph examiner's questioning designed specifically to yield incriminatory statements. *United States v. Warren* (5th Cir. 1977), 550 F.2d 219.

Thus, we need not determine if the defendant's consultation with attorney Stepanich satisfied his right to counsel under *Miranda* since the defendant was not even entitled to *Miranda* warnings at that time.

Secondly, we find the defendant's conversations with Officer Hessian and Corporal Harceg at Larson's office to be non-custodial. It is true that the officers were aware that the defendant had admitted to Larson that he had walked the deceased to her driveway, but the officers' investigation still had not focused on the defendant—although, admittedly, he might have been a suspect—nor had his freedom of movement been restricted by the officers. (*People v. Gamble* (1976), 41 Ill. App. 3d 394, 353 N.E.2d 136; *Linnemeier v. State* (Ind. App. 1975), 330 N.E.2d 373; see also *United States v. Booth* (D.S.C. 1975), 399 F. Supp. 975.) So at this time, although Corporal Harceg did read the defendant his *Miranda* rights and the defendant did sign a notification of rights document that stated he had been informed of his rights, these steps were not constitutionally mandated because the defendant was neither in custody nor deprived of his freedom of action in any significant way. (*Miranda*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602.) Certainly the defendant did not have any reasonable basis to believe he was under arrest at the polygraph office under the rationale of the recent supreme court opinion in *People v. Wipfler* (1977), 68 Ill. 2d 158, 166, 368 N.E.2d 870, 873, wherein the court stated that:

> "The accepted test of understanding is not what the arrestee thought, but 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' [Citations.]"

Under the circumstances herein, a reasonable person, innocent of any criminal activity, certainly would *not* have believed he was under arrest, especially where the defendant had continually asserted his innocence and noncomplicity in this crime. In fact, both Detective Hessian and Corporal Harceg believed the defendant was not in custody at this time and that he was free to go home, even when they were going to the

sheriff's office to continue the questioning. We also find that the nature of the officers' conversations in this noncustodial situation with the defendant were not unduly coercive as to require that the defendant receive *Miranda* warnings, even though the defendant may have been a suspect at that time. As the Supreme Court recently noted in *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714:

> "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."

In the instant case, there is no evidence that the defendant's freedom to leave the polygraph office had been restricted in any way by the police as to render him in custody. The defendant further *voluntarily* went with the officers across the street to the sheriff's office to continue going over his story. At this time, the defendant was not in custody, in handcuffs, nor deprived of his freedom of action, and was not entitled to *Miranda* warnings.

■■■ Also, we need not reach the corollary question pertaining to at what point the defendant *was* in custody for *Miranda* purposes, because the pivotal issue here is whether the defendant was entitled to *Miranda* warnings while at Larson's office. However, even assuming arguendo that the defendant was in custody at Larson's office when he first spoke to the officers, his subsequent statements made at the sheriff's and State's Attorney's offices were admissible because the defendant had voluntarily withdrawn his request to speak to an attorney and had waived his right to counsel. As our supreme court recently stated in *People v. Morgan* (1977), 67 Ill. 2d 1, 5-6, 364 N.E.2d 56, 58, in discussing the requirements of *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321:

> "If a defendant may waive his right to silence after initially claiming it, his initial request to have an attorney present may also be voluntarily withdrawn. An initial request for counsel is not irreversible, absent a showing that the expressed desire to make a statement without the presence of counsel was made under the force of continued impermissible interrogation."

The court in *Morgan* found that none of the defendant's constitutional rights were infringed and that the defendant was properly given his *Miranda* warnings, that his initial request for counsel was scrupulously honored, and that his statement was not taken until after he had expressed his desire to give it without the presence of counsel. Likewise, the defendant's statements herein were made after he had signed a form which notified him of his rights and after he had been informed of his *Miranda* rights by Corporal Harceg, Sergeant Zeason and Mr. Cummins. In addition, his statements were not the product of prolonged interrogation nor were they in derogation of any of his constitutional rights. Also, the defendant's initial request to speak to an attorney—which was made to an independent examiner before he was in custody—was complied with, even though such a demand was not constitutionally mandated under *Miranda*. Under these circumstances we hold that the defendant voluntarily withdrew his request for counsel. *People v. Morgan* (1977), 67 Ill. 2d 1.

We next consider whether the defendant voluntarily and knowingly waived his right to have counsel present during the interrogation and whether his statements to the police and State's Attorney were inadmissible. The defendant contends that his interrogation should have ceased when he asserted his right to speak to an attorney in the polygraph office and that his right to appointed counsel was not satisfied by his hasty consultation with attorney Stepanich. However, these contentions are clearly without merit because we have previously determined that the defendant did not have the right to counsel or *Miranda* warnings at this time because he was not in custody.

The applicable standard for determining whether the defendant voluntarily waived his right to counsel was set forth by the Supreme Court in *Brewer v. Williams* (1977), 430 U.S. 387, 404, 51 L. Ed. 2d 424, 439-40, 97 S. Ct. 1232, 1242, wherein the court stated:

"'* * * that it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' [Citation.] That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant. [Citations] and that courts indulge in every reasonable presumption against waiver, [citations.] This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. [Citations.]"

We find that defendant's statements, when judged by these standards, were voluntary and that the State conclusively established that the defendant intentionally relinquished his right to counsel.

We have considered the recent supreme court opinion of *People v.*

*Washington* (1977), 68 Ill. 2d 186, 369 N.E.2d 57, cited by the defendant and conclude that it is inapposite to the circumstances herein, where the State has met its heavy burden and demonstrated " 'that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' [Citation.]" *People v. Washington* (1977), 68 Ill. 2d 186, 191.

■■ We further find that the trial court's determination that the defendant voluntarily and knowingly waived his *Miranda* rights was not against the manifest weight of the evidence. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) Accordingly, the defendant's inculpatory statements made to the officers and Assistant State's Attorney were properly admitted.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

SEIDENFELD and WOODWARD, JJ., concur.