THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EDWARD MILLER (Impleaded), Defendant-Appellant.

First District (4th Division)    No. 80-265

Opinion filed October 8, 1981.

Ralph Ruebner and Eva Field, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Adrienne Noble Nacev, Casimir J. Bartnik, and Richard T. Sikes, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

Following a jury trial the defendant, Edward Miller, was convicted of murder and two counts of attempted murder. He received concurrent sentences of 50 to 100 years for murder and 10 to 20 years for each attempted murder. On appeal defendant contends: (1) a series of erroneous evidentiary rulings by the trial court deprived him of a fair trial; (2) prejudicial arguments by the prosecutor also deprived him of a fair trial; and (3) his sentences were excessive.

We affirm.

At trial Derrick Williams, 16 years old at the time of the incident, testified that on April 7, 1975, he lived with Vincent Reed and Sylvia Wells in a basement apartment at 5329 South Kimbark in Chicago. That evening defendant, whom Williams had known for five or six days, and a man termed by Williams as defendant's partner and described by him only as tall had a conversation with Reed and Williams at the apartment. Defendant told them that Deola Brown, a prostitute who lived on the second floor, had a customer in her apartment with $600. Williams obtained a .38-caliber gun from the defendant. He disguised himself as a

woman, wearing Wells' white coat, a blond wig, and sunglasses. Thus attired he went to Brown's apartment, knocked on the door, and gained entrance, having called out a name in a disguised voice. Inside were Wells, Brown, and the customer. Reed and defendant remained on the stairway. Williams announced a robbery and took a watch and a little over one dollar from the customer. At trial Williams contended that Wells and Brown had not been involved in the robbery scheme. He escorted the three outside to the customer's car. The women searched the car but found nothing and the customer was then sent on his way.

Williams returned the gun to defendant and also gave him the watch. However defendant accused them of having hidden the money, and he and Williams got into what Williams termed a "light argument."

The next evening defendant, his tall partner, and a third man, whom defendant had seen before, returned to the apartment. The conversation initially was amicable but defendant then demanded his money. An argument ensued and defendant announced that if they did not produce the money he would kill them. He pulled out the same .38-caliber gun Williams had used the day before. Williams told him to put the gun away and to respect the "crib" (home). At this point defendant's tall companion was blocking the doorway. The other man turned up the volume of a record player in the living room. In succession defendant shot Reed, who was seated at a desk about one and a half yards away, then Wells, seated on a sofa about one to two yards away, and then Williams, from the same distance as Wells. He and his companions then left.

Williams first shook Reed to see if he was all right and then went up one flight of stairs, where he apparently collapsed. He saw Reed go by him up to the second floor.

Williams was taken to Billings Hospital where he was questioned that evening and again on April 13 by the police. He was shown five photographs and recognized one as that of the defendant. At trial he also admitted that he initially told the police that defendant had lived with Wells and the quarrel was about her. He admitted that this was a lie, told to avoid implicating himself in the armed robbery he had committed. Although Wells had not been living with Williams for the two and one half to three months he had known her, he did not know with whom she had been living before living with him. He had never known her to live with the defendant. But it was not until April 26 of that year that Williams admitted to the police that he had been lying about this. At trial Williams also admitted that he had been convicted of theft in January, 1976.

Sylvia Wells, 15 years old at the time of the shooting, testified to substantially the same facts concerning the shooting as had Williams, with the following differences and additions. At the time of the incident she was not living with Williams but was living "on the other side" at 5327

South Kimbark with an unnamed boyfriend. However she also testified she was Williams' girlfriend at that time although she had never lived with him. She had only known him then for about two weeks. Wells had known the defendant for about a year. She named his two companions that evening as Herman Samuels and "Richardson."

Immediately before the shooting, which Wells also recalled defendant accomplished with a .38-caliber revolver, defendant told her he would shoot her too and made her sit on the floor. He shot Reed at the desk, Williams on the couch, and then her. She passed out and awoke in the hospital.

Wells testified that the day before the shooting she was in Deola Johnson's apartment with Deola and Deola's "trick" ( customer). Williams, armed with the same gun defendant used the next day and dressed like a lady, knocked on the door and said his name was Janice. On Deola's instruction Wells let him in. Williams forced the customer to undress and took a dollar and some change from him. He then told all of them to go downstairs where he ordered Wells and Deola to search the man's car. At this time Wells observed defendant standing outside with Herman Samuels. A week before she had seen defendant with the same gun he subsequently used to shoot her. Wells identified defendant in court as the man who had shot all three victims.

On cross-examination Wells admitted that during the period in which these events occurred she was a heroin user and at the time of the shooting she was "high off marijuana." She, Williams, and Reed had smoked three or four "joints" between 6:30 p.m. and when defendant came in. However she estimated she had smoked only half of one and testified she was able to see and hear everything going on in the apartment. Defense counsel also elicited from Wells an admission that she had been known by one other name.

Although Wells persisted in her identification of defendant's gun as a .38-caliber weapon, she admitted she did not know whether a .38 was smaller than a .45 and she generally admitted to not having a great degree of knowlege about guns.

Also testifying for the State were Chicago Police Officers Straza and Deacy. They were on patrol in the area the evening of April 8, 1975, when Kenneth Johnson stopped them and told them three people had been shot at 5329 South Kimbark. In the foyer of the building they found Williams lying in a pool of blood with a gunshot wound to the face. Following a trail of blood into the apartment Straza found Wells in a crouched position on the couch. She too had been shot in the face. Deacy found Reed on the stairs near the second floor landing. No weapons were found in the apartment.

Officer William Sherlock, a police mobile unit technician, identified

certain photographs he had taken at the scene. He testified that he found blood on and near the couch, on the floor of the vestibule of the building, and on the landing between the second and third floors. No weapons, cartridge cases, or bullets were found.

Police Homicide Investigator Robert Strahlman testified that he spoke to Williams at Billings Hospital the evening of the shooting and obtained from him a description of the shooter and a nickname. He showed Wells five photographs. After this he went to the defendant's home but did not find defendant there or at other locations in the city. Strahlman served an arrest warrant on the defendant October 16, 1975, in New Orleans.

Strahlman confirmed that Williams first told him the shooting occurred because he and Reed were living with Wells, who had been living with the defendant. Only after Strahlman confronted Williams on April 26, 1975, with his knowledge of the robbery that had occurred the day before the shooting did Williams admit that he had been lying about Wells having lived with the defendant. Williams told him he had lied because he did not want to be involved in the robbery.

Two doctors testified to having removed bullets from Wells and Williams and described the extent of their injuries. The pathologist who performed the autopsy on Reed testified that his death was caused by a gunshot wound to the head which caused damage to the cervical spinal cord and resulted in Reed choking from the aspiration of the contents of his stomach.

The parties stipulated that certain State exhibits were the bullets removed from the three victims. Sergeant Donald Smith, a firearms examiner with the Chicago Police Department, testified that upon examination of the bullets he determined they all showed characteristics of having been fired from a .38-caliber Special revolver. He could not determine whether they were all fired from the same weapon. He also conceded that the bullets could have been fired from .38-caliber weapons made by a number of different manufacturers.

Defendant testified in his own behalf, denying that he was present in the apartment the night of the shooting or that he had committed any of the crimes of which he was charged. Indeed, although he admitted having visited Kenneth and Deola Johnson on prior occasions in the building, he denied ever having been in the basement apartment. He contended that he had only met Williams, Wells, and Reed once, at a shopping center in late March or early April of 1975. He had known Herman Samuels and Willie Nickerson for 15 years. Defendant also denied any knowledge of the robbery that occurred the day before the shooting.

Defendant admitted that in 1975 he owned a .38-caliber Special revolver but stated he always kept it at home. He could not remember

where he was on the night of the shooting, but testified that in late March or early April 1975 he travelled to Louisiana with his wife and child to begin construction of a home on land donated by his grandparents. He stayed there until he was arrested. In April of that year he had heard from his wife, who had returned to Chicago, that the police were looking for him. He told her that he had done nothing and instructed her to tell the police where he was. While in Louisiana he used his own name and social security number in his employment. Defendant also testified that in 1969 he was convicted of indecent liberties with a child and placed on probation for one year.

## I

Defendant contends that a series of erroneous evidentiary rulings by the trial court deprived him of a fair trial. We first consider his contention that the trial court abused its discretion in denying his motion *in limine* to bar the State from introducing evidence of his prior conviction.

Under the rule adopted in *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695, 698, the credibility of a witness may be attacked by evidence that he has been convicted of a crime only if the crime:

"* * * (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. * * * Evidence of conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date."

The conviction at issue was punishable by imprisonment for a period in excess of one year and occurred within 10 years of trial, therefore it was within the outside limitations established by *Montgomery*. The factors to be considered in determining whether in a particular case such evidence should in fact be permitted are: the nature of the crime, the nearness or remoteness in time of the conviction to the present trial, the subsequent career of the person, and whether the crime was similar to the one charged. (*Montgomery*, 47 Ill. 2d 510, 518, 268 N.E.2d 695, 700; *People v. Spates* (1979), 77 Ill. 2d 193, 205, 395 N.E.2d 563, 569; *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, 940.) In this case the fact that the conviction was almost nine years old tends to weigh against its admission. However, because it was punishable by over one year in prison it is presumed to relate to the credibility of the witness. (See *Knowles v. Panopoulos* (1977), 66 Ill. 2d 585, 589, 363 N.E.2d 805, 808; *People v. Spates* (1979), 77 Ill. 2d 193, 204, 395 N.E.2d 563, 568-69.) Finally, as the

trial judge specifically noted, this was not a conviction for a crime similar to those with which defendant was charged. This tended to reduce the possibility that the jury would interpret this evidence as tending to prove the defendant committed the crime, despite the proper limiting instruction they received. (See *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, 940.) Upon evaluation of these factors we find no basis for determining that the trial court abused its discretion in allowing evidence of the conviction to be introduced.

■■ Defendant contends that the trial court erroneously allowed the State's motion *in limine* to bar defendant from introducing evidence concerning two judicial dispositions in which Sylvia Wells received periods of supervision for theft and soliciting for prostitution. Defendant concedes that under Illinois law discharge and dismissal upon a successful conclusion of a disposition of supervision is not considered a conviction (Ill. Rev. Stat. 1977, ch. 38, par. 1005—6—3.1(f)), and thus could not ordinarily be used under *Montgomery*. However he asserts that Wells might not have successfully completed the supervisionary periods and thus could have been convicted of the offenses charged. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—6—4(e).) However, no such contention was made at trial by defense counsel even though it is clear from the record that counsel possessed Wells' arrest record, which would have showed any such dispositions. The party seeking to impeach testimony with a conviction has the responsibility of presenting proper evidence of the impeaching conviction. (*People v. Yost* (1980), 78 Ill. 2d 292, 297, 399 N.E.2d 1283, 1285.) Accordingly, the trial court did not err in granting the State's motion absent a showing by defendant that convictions existed.

■■ At trial defense counsel also sought the court's permission to question Wells concerning her use of other names and her use of narcotics. Defendant contends that the trial court improperly limited cross-examination on both these subjects. With respect to Wells' use of other names, the record establishes that counsel was permitted to elicit from the witness everything he sought: Wells' use of other names and the number of such names used. On the question of Wells' use of narcotics, counsel conceded at trial that he was unprepared to offer any proof of Wells' addiction should she deny it. The trial judge thus properly denied his request to question her as to whether she had been an addict. (*People v. McCommon* (1979), 79 Ill. App. 3d 853, 399 N.E.2d 224; *People v. Ganci* (1978), 57 Ill. App. 3d 234, 372 N.E.2d 1077.) Furthermore, counsel indicated to the trial court that what he sought to establish by this questioning was whether Wells was under the influence of drugs at the time of the incident. He was then allowed to question her specifically as to her use of drugs at that time. He elicited from her the dual admission that she was using heroin during that period and was under the influence of marijuana when the

shooting occurred. We thus find no basis for defendant's claim of prejudice.

■■ Defendant cites as error the fact that the State elicited from Investigator Strahlman the information that he had arrested Herman Samuels and Willie Nickerson several weeks after the shooting. The indictments read to the jury at the beginning of trial charged these men with the same crimes as defendant. During trial Sylvia Wells identified the men with the defendant as Herman Samuels and "Richardson." Defendant successfully objected to the questioning of Strahlman concerning these arrests. He has not specified the manner in which this questioning prejudiced him, and we determine in any event that any error was cured by the court's action.

■■ Investigator Strahlman also testified that Williams was shown five photographs at the hospital after the shooting. A successful defense objection prevented the State from eliciting what Williams did when shown these photographs. However Strahlman then testified that after he showed them to Williams he proceeded to defendant's parents' home. Defendant contends that this constituted impermissible hearsay evidence tending to bolster Williams' identification of the defendant. But even assuming, *arguendo*, that Strahlman's testimony describing his own actions amounted to a statement that Williams identified defendant from the photographs, such testimony was admissible because Williams had previously testified to that same fact. *People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.

■■ Defendant generally objects to what he terms prejudicial and cumulative evidence adduced by the State concerning the manner in which the victims were shot, the extent of their injuries, and the bloodstained condition of the apartment and surrounding area after the shooting. Defendant apparently contends this evidence was improper because the only fact at issue was who committed the shootings. But the fact that a defendant does not deny that a crime was committed does not preclude the State from fully establishing the facts concerning that crime. (*People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.) The evidence objected to on appeal by defendant tended to corroborate the testimony of the State's eyewitnesses concerning the circumstances surrounding the shooting and was properly admitted for that purpose.

■■ Defendant also cites as error the submission to the jury of certain photographs which had been admitted into evidence. The photographs depicted the apartment and the entrance to it as they were found by the police. These included certain bloodstained areas which tended to corroborate the testimony of the victims and the police concerning where the victims were when shot and where they went after the shooting. Some of the photographs were also used by State witnesses as aids in their

testimony concerning the shooting and its aftermath. Limitation of the extent of the use of this evidence was within the discretion of the trial court. (*People v. Speck* (1968), 41 Ill. 2d 177, 242 N.E.2d 208; *People v. Jenko* (1951), 410 Ill. 478, 102 N.E.2d 783.) In this regard we note that the trial court, in the exercise of this discretion, barred from submission to the jury photographs of the deceased and the clothing of the deceased which it deemed to be unnecessarily prejudicial. We do not find that the trial court abused its discretion in these rulings.

## II

■■ Defendant has included in his brief a voluminous list of comments by the prosecutor which he contends deprived him of a fair trial. In all but one of the instances cited either defendant did not object at all or his objections were sustained. Our review of all the comments cited by defendant in the context of the entire final argument and the record as a whole convinces us that those comments did not constitute a material factor in defendant's conviction and thus do not support reversal of his conviction. *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.

## III

■■ Finally, defendant contends that his sentences were excessive. In passing sentence the court explained that it had considered defendant's relatively minor past criminal record as well as what it termed defendant's "most severe, most brutal" behavior in committing the offenses at issue. We do not find that the court abused its discretion in sentencing the defendant and consequently we will not disturb those sentences. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

The judgment of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.