THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH ANDERSON, Defendant-Appellant.

First District (5th Division)   No. 85—1818

Opinion filed March 13, 1987.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Christopher J. Cummings, and Michael J. O'Brien, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to a term of 30 years. On appeal, he contends that (1) the trial court erred in (a) admitting evidence concerning gang activity and his affiliation therewith; (b) giving, over his objection, Illinois Pattern Jury Instruction, Criminal, No. 2.04 (2d ed. 1968), referring to his failure to testify; (2) he was denied a fair trial by (a) the State's use of rebuttal testimony as substantive evidence; (b) the ineffectiveness of his counsel; and (3) the trial court abused its discretion in imposing sentence.

The charges arose from the death of Keith Jordan on January 25, 1984, which, according to Medical Examiner Robert Stein, resulted from a skull fracture and attendant subdural hematoma caused by a trauma to the head with a blunt instrument. At trial, Juanita Toomer testified that at about 5:30 a.m. on Sunday, January 22, 1984, she was walking on the east side of Pulaski Avenue near 16th Street in Chicago when she heard someone cry out, "Oh, God, someone help me, please." She looked across the street and saw two men, who appeared to be about 6 feet 1 inch and 6 feet 3 inches tall, respectively, chasing a third man—later identified as Keith Jordan. When Jordan, who had been running in a slightly crouched position, stumbled and fell, the other

two men began to kick and beat him. Moments later, a fourth man, who was approximately 5 feet 4 inches tall—which defense counsel agreed is defendant's approximate height—ran from the middle of the street between some parked cars and joined the taller men, one of whom repeatedly struck Jordan with an 18- to 24-inch metal pipe. At that point, she screamed, whereupon the three men stopped, looked toward her, and then ran in the opposite direction (north) on Pulaski Avenue. When she walked up to Jordan, who was lying on the ground and had blood on his face and hands, he grabbed her coat sleeve and asked her to call the police. One of the three assailants then said, "Let's get her," upon which she ran to a restaurant, told a waitress what she had seen, and asked her to call the police. She remained at the restaurant until the police arrived and although she was very upset, she reported to them what had occurred and shortly thereafter accompanied them to Mt. Sinai Hospital. After identifying photographs of Jordan and the scene where the beating occurred, Toomer stated on cross-examination by defendant's attorney and by counsel for codefendant, Larry Glasco, that she was about 40 feet from the group of men; that the short man did not have anything in his hands when he ran across the street toward the others; that she did not notice anyone in the group carrying a stick; that she knew Glasco for about 13 years; that he was about the same height as the taller men; and that although she saw the faces of the three assailants, she did not recognize any of them.

Chicago police officer Lynn Kennedy testified that at about 6 a.m. on January 22, 1984, she and her partner responded to a call of "a man down" near 16th Street and Pulaski Avenue, but when they arrived at that location, they did not see anyone. They proceeded to a nearby restaurant where they spoke with Juanita Toomer, who was visibly upset and crying. She accompanied them to the scene of the incident, where they noticed a man slumped over in a doorway. There was considerable blood on his face and the only words he spoke were, "Help me, please." On cross-examination, Officer Kennedy stated that in response to their questions at the hospital, Toomer—who was still extremely agitated—said that only two men were involved in the offense and that neither had kicked Jordan but, rather, had beaten him with what appeared to be some type of pipe.

Joseph Anderson, who is not related to defendant, testified that after leaving his job at a suburban restaurant at about 2 a.m. on the night in question, he went to a friend's house near 14th Street and Avers Avenue, where he remained until 5:30 or 6 o'clock. As he approached Harding Avenue on his way home, he heard voices from a

porch on the southwest side of the street shouting "Outlaw Soul Brothers," and "folks popping, people dropping," which he knew to mean that the Outlaw Soul Brothers street-gang members were fighting with the Vice Lords, a rival street gang. Being a member of the Vice Lords, he at first presumed the gang slogans were directed toward him, but then saw Keith Jordan, a fellow member of the Vice Lords known as "Chip," walking northbound on Harding Avenue. There were about four men on the porch, and as Jordan approached they shouted again and gestured, by means of hand signals known among gang members, that they were Outlaw Soul Brothers and "Vice Lord killers." When Jordan returned a signal indicating that he was a Vice Lord, the four men came off the porch and began chasing him. Anderson recognized defendant—whom he knew only as "Keno"—and Glasco as two of the pursuers and also saw that defendant was carrying what looked to be a pipe and Glasco was holding a stick. After running only a few feet, Jordan slipped and fell, whereupon the men surrounded him and defendant and Glasco began swinging the pipe and stick down toward the ground. Jordan managed to get up, but defendant immediately hit him in the back of the head with the pipe, causing him to fall again, following which the men encircled him and resumed swinging at him with the pipe and stick. At that point, he (Anderson) ran south toward 16th Street, where he met two strangers whose help he solicited, but by the time they returned to the scene of the incident, armed with bottles and sticks, no one was there, which led him to believe that Jordan had escaped. The following Wednesday, he heard that Jordan was hospitalized, but it was not until a few days after learning that Jordan had died that he called Chicago police officer Earl Pickett to report what he had witnessed. After a conversation with Pickett, he identified photographs of defendant and Glasco as two of the assailants and also identified both of them a few days later in a lineup. He acknowledged that charges for possession of marijuana were pending against him, but stated that no offers of leniency in connection therewith had been made in exchange for his testimony.

On cross- and redirect examination, Anderson further testified that each gang controlled certain "territory" into which rival gang members generally were not allowed to intrude; that the area where the beating occurred was controlled by the Outlaw Soul Brothers; that as the Vice Lord's "minister of justice," he met with the other high-ranking officers once a week to discuss gang-related matters and was responsible for resolving internal gang problems and for determining appropriate punishments for violations of the gang's codes and ethics, but that he resigned from that position and moved away from the

neighborhood about three months after this incident; that he did not come to Jordan's assistance because he knew that he too would be beaten, nor did he subsequently tell the other officers of the Vice Lords what he had seen because he feared retribution by them for violating the oath all members took to assist fellow members "in trouble" with rival gangs. He conceded that, at first, he told Pickett that the incident had occurred between 3:30 and 4 a.m., explaining that he did not want his wife to know that he had spent most of the night at his girlfriend's house after leaving work. He also acknowledged having been convicted of robbery, aggravated battery, and unlawful restraint, for which he was on probation.

Over objection, Officer Patrick Hackett, assigned to the gang-crimes unit, testified that in a conversation with defendant following his arrest for disorderly conduct in October 1982, defendant told him that he was a member of the Black Outlaw Soul gang—another name sometimes used by the Outlaw Soul Brothers—and that his street nickname was "Keno." At that time, Hackett also observed the insignia of the Outlaw Soul Brothers tattooed on defendant's arm. Officer Gerald Johnson, a gang-crimes specialist, was called to testify concerning area street-gang activities in general.

Detective Angelo Rinchiuso testified that he and his partner arrested defendant and Glasco on January 30, 1984, and after conversations with them, placed them in a lineup with six other men.

In defense, Glasco called various friends and relatives, all of whom testified that he was at home with them on the night in question, and also took the stand in his own behalf, testifying both to his alibi and that neither he nor any of his friends were gang members. Defendant also presented several alibi witnesses who stated that he was with them at the time in question, but he did not testify in his own behalf.

After both defendants had rested, Detective Rinchiuso was recalled and testified in rebuttal that in conversations following his arrest, defendant initially denied any knowledge of the murder, but later stated that although he had not been involved, he had witnessed it, explaining that he had seen Jordan—known to him only as "Chip"— when he and several friends went to a liquor store and nearby lounge earlier Saturday evening; that much later that night he and his companions gathered on a porch and began yelling "Outlaws"; that they eventually left the porch and were walking down Pulaski Avenue when they encountered Jordan, who was drunk; that when Jordan tried to run away, one of the men, known as "Zel," grabbed him by the sleeve and someone else in the group hit him with a stick; and that when Jordan fell, he (defendant) left the scene.

OPINION

We first consider defendant's contention that the trial court committed reversible error in giving, over his counsel's explicit objection, Illinois Pattern Jury Instruction, Criminal, No. 2.04 (2d ed. 1968) (hereinafter IPI Criminal 2d), which reads:

"The fact that a defendant did not testify should not be considered in any way in arriving at your verdict."

The committee note following IPI Criminal 2d No. 2.04 states:

"This instruction should be given *only* at the defendant's request and then, it *must* be given." (Emphasis in original.)

■ As reflected in the language of the committee note, it has been recognized that while this instruction is intended to benefit a defendant by cautioning the jury not to infer guilt from his failure to testify, it might, on the other hand, have the negative effect of calling the jury's attention thereto. Courts have therefore held that the choice of whether the instruction will be used is the defendant's and that the giving of it over his objection is error. (*People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328; *People v. Lee* (1976), 44 Ill. App. 3d 43, 357 N.E.2d 888; *cf. People v. Gibson* (1971), 133 Ill. App. 2d 722, 272 N.E.2d 274 (the determination as to whether IPI Criminal 2d No. 3.13—advising that a defendant's prior convictions may be considered only insofar as they affect his credibility as a witness—is beneficial or detrimental to his defense, is the defendant's prerogative, and the giving of the instruction over his objection is error).) Because of the constitutional implications (*People v. Ramirez* (1983), 98 Ill. 2d 439, 457 N.E.2d 31; *People v. Brooks* (1984), 124 Ill. App. 3d 222, 463 N.E.2d 1326), such error requires reversal unless it is determined to have been harmless beyond a reasonable doubt, *i.e.*, that it did not contribute to the conviction. *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328; *People v. Lee* (1976), 44 Ill. App. 3d 43, 357 N.E.2d 888.

For example, in *People v. Hicks* the court declined to reverse the defendant's conviction, finding that because he had moved for a directed verdict at the close of the State's case, the "impact on the jury of [his] failure to present any evidence could not have been lost" and that in view of the overwhelming evidence of his guilt, the giving of the instruction over his objection was harmless error. (*People v. Hicks* (1981), 101 Ill. App. 3d 238, 243-44, 427 N.E.2d 1328, 1332.) In *People v. Brooks* (1984), 124 Ill. App. 3d 222, 463 N.E.2d 1326, two defendants were tried jointly for murder and neither testified in his own behalf. At the instruction conference, a disagreement arose concerning the giving of IPI Criminal 2d No. 2.04, which was tendered by the co-defendant and objected to by defendant Brooks. On appeal, the court

noted that the possible conflict between the codefendants regarding the giving of IPI Criminal 2d No. 2.04 had not been raised in the pretrial motion for severance and held that because under the holding in *People v. Ramirez* (1983), 98 Ill. 2d 439, 457 N.E.2d 31, the trial court's refusal to give it would have constituted reversible error with respect to the codefendant who had requested it, the giving of it over defendant Brooks' objection was not error. 124 Ill. App. 3d 222, 227-28, 463 N.E.2d 1326, 1331.

In contrast, the error in giving IPI Criminal 2d No. 2.04 over objection was found to be reversible in *People v. Lee* (1976), 44 Ill. App. 3d 43, 357 N.E.2d 888. There, seven codefendants were tried jointly on charges arising from a tavern brawl. All three of the defendants who did not testify in their own behalf objected to IPI Criminal 2d No. 2.04 when it was tendered by the State. On appeal, the court held that the trial court erred in giving the instruction over their objections and, finding that the evidence was not so clear and convincing or proof of guilt so overwhelming as to render the error harmless, reversed their convictions and remanded for a new trial.

■ Turning then to the instant case, we note that when the State tendered IPI Criminal 2d No. 2.04 at the instruction conference, defense counsel objected to it on his belief that it would prejudice defendant by calling attention to the fact that, unlike Glasco, he had declined to testify in his own behalf and thereby would penalize him for exercising his fifth amendment rights. In overruling the objection, the trial court reiterated the position it took on defense counsel's earlier objection to IPI Criminal 2d No. 1.02—which includes a clause referring to the weight to be given a defendant's testimony—commenting that where two defendants are charged with the same crime, the fact that a defendant chose not to testify does not preclude the court from submitting the instruction. From its remarks, it is apparent that the trial court based its ruling on the fact that the case involved a codefendant (Glasco). We note, however, that unlike the codefendant in *Brooks*, Glasco did take the stand in his own behalf. Therefore, the instruction was wholly inapplicable to him and could only have been taken by the jury as a reference to defendant's failure to testify. As such, the giving of it over his objection was error. Thus, the remaining question is whether that error, when viewed in the context of the trial as a whole, was harmless beyond a reasonable doubt.

Preliminarily, we note that defendant does not contend, nor do we believe, that the evidence presented was insufficient to support his conviction. In any event, the question is not whether the evidence was sufficient to sustain the jury's verdict but, rather, whether it can be

said that the error in giving the instruction could not have contributed to it. *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328; *People v. Lee* (1976), 44 Ill. App. 3d 43, 357 N.E.2d 888.

Upon our careful review of the record, we are unable to state that the evidence admitted at trial was so overwhelming that the error in giving this instruction could not have contributed to the guilty verdict. For this reason, defendant's conviction for murder must be reversed and the cause remanded for a new trial.

In the light of this determination, we need not address those of defendant's contentions relating to the effectiveness of his counsel or the sentence imposed at the initial trial.

Defendant also contends, however, that he was denied a fair trial by (1) the admission of irrelevant and prejudicial evidence regarding (a) the activity of local street gangs and (b) his affiliation therewith, presented through the testimony of gang-crime Officers Johnson and Hackett, respectively, and (2) the State's use of Officer Rinchiuso's rebuttal testimony concerning his post-arrest statement as substantive evidence.

As with the issues mentioned above, we are of the opinion that in view of our judgment that this case should be remanded for a new trial, it is not necessary for us to decide whether the evidence challenged by defendant was properly admitted and/or used at the trial from which this appeal is taken. Furthermore, we believe that any gratuitous discussion thereabout on the basis of the record before us would be inappropriate since it is impossible to know whether or in what context the evidence at issue might be offered on retrial. Recognizing, however, that these or similar evidentiary questions may arise at a future trial, we offer the following guiding principles.

■■ ■ With respect to the officers' testimony relating to gang activity and defendant's membership in the Outlaw Soul Brothers, this court has held that the determination of whether a witness is qualified to testify as an expert on street gangs lies within the discretion of the trial court (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671); that proof of gang membership is relevant and admissible where there is sufficient proof of a relationship between such affiliation and the crime charged, *e.g.*, to show a motive or common purpose (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671); and that where its relevance is so established, such evidence need not be excluded merely because of its tendency to prejudice the defendant

*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840; *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207; *People v. Calderon* (1981), 98 Ill. App. 3d 657, 424 N.E.2d 671.

In this regard, we note that an admission is *any* statement of fact by a party which, when taken in connection with other facts in evidence, permits an inference of guilt of the offense charged; and any admission by a defendant, even if intended to be exculpatory, is admissible as substantive evidence for the purpose of showing guilt. *People v. Lippert* (1984), 125 Ill. App. 3d 489, 466 N.E.2d 276; *People v. McDowell* (1984), 121 Ill. App. 3d 491, 459 N.E.2d 1018; *People v. Burns* (1981), 99 Ill. App. 3d 42, 424 N.E.2d 1298; *People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369.

For the reasons stated herein, defendant's conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded.

LORENZ and MURRAY, JJ., concur.