THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM ATKINS *et al.,* Defendants-Appellants.

First District (2nd Division) Nos. 85—1769, 85—1817 cons.

Opinion filed September 22, 1987.

James J. Doherty, Public Defender, of Chicago (Frank P. Madea, Assistant Public Defender, of counsel), for appellant Larry Gross.

Steven Clark and Karen Michels, both of State Appellate Defender's Office, of Chicago, for appellant William Atkins.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Anita M. Alvarez, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

A jury convicted defendants Larry Gross and William Atkins, brothers, of murder and conspiracy to commit murder. Atkins was sentenced to concurrent terms of 22 years for murder and 7 years for conspiracy. Gross was sentenced to concurrent terms of 26 years for murder and 7 years for conspiracy. On appeal, defendants contend: (1) they were denied their constitutional right to conflict-free representation and effective assistance of counsel; (2) the trial court erroneously denied severance; and (3) their convictions for conspiracy must be vacated. Defendant Atkins further contends that the State failed to prove him guilty beyond a reasonable doubt. Defendant Gross further contends that the trial court erroneously instructed the jury.

William Atkins, Larry Gross, John Mahogany and Eddie Woods

were charged with murder, armed violence and conspiracy in connection with the December 9, 1983, shooting of Jerome Wells, a gang chief. Codefendants Mahogany's and Woods' trials were severed and they are not involved in this appeal. Defendants Atkins and Gross were tried jointly, represented by the same trial counsel.

The evidences show that on December 9, 1983, a group of eight or nine youths met at Woods' apartment located on West Van Buren Street, Chicago, Illinois. A field separates Woods' apartment building and the building where the murder occurred.

Robert Ervin testified that on December 9, 1983, at about 4 p.m., a group, including Gross and Atkins, met at Woods' apartment. The group talked about how a Vice Lord had to be killed because some time earlier, Tom Slick, a member of the Black Soul gang, was killed. Ervin testified that Woods went into a back room and emerged with several guns which he then handed out to the group. Gross took a shotgun and shot it into a hallway to see if it was working. Afterwards, Gross ordered the group to move across the field between the buildings in twos and meet at Gross' mother's apartment. Gross' mother's apartment is located in the building where the murder occurred.

The first time the group left the building, someone saw the police so they all ran back to Woods' apartment. A short time later, the group went across the field to Gross' mother's apartment, where the weapons were redistributed.

Within a short time, a youngster named "Mookie" (Gross' nephew) came to the door and told them that the victim was on his way upstairs. Gross took charge and the group split up, each going into different stairwells. Gross' mother's apartment was on the sixth floor and the victim lived on the seventh floor. Ervin also testified that everyone left the apartment and went into the stairwells except for him. Gross said "to go get him" (the victim). Shortly thereafter, Ervin heard five shots. Then, Ervin, Woods and Clark, another member of the group, returned to Woods' apartment. Ervin testified that Gross stayed in his mother's apartment, heard the shots, went onto the porch but returned to the apartment when his mother called him back in. Atkins was not in the apartment when the shots were fired.

Seventeen-year-old Evon Moore testified that on that date at about 4 p.m., she was standing on the ramp of the building between apartments talking to friends. At first she saw Woods peeking around the corner of the ramp. About 10 minutes later, she saw Woods leaving the building with a group of about eight or nine youths. She identified Gross and Atkins as members of this group. The group crossed

the field in twos and then went into the other building. About 15 or 20 minutes later, she saw a young man walk towards an apartment on the seventh floor, reach for the door, then fall. She heard six shots, which came from the west end of the seventh-floor ramp. She saw only the hand and wrist of the person doing the shooting. Later, she saw the group of youths, including Gross and Atkins, leave the building.

Police officers testified that while no weapons were recovered from the scene, a .45 caliber bullet was recovered that matched a bullet later recovered from the victim's body by the medical examiner. These two bullets were fired from the same gun.

Troy Johnican also testified for the State. His testimony at trial placed Gross and Atkins at Woods' apartment. He testified that the group left Woods' apartment to go to Gross' mother's apartment to drink some beer. He did not see any guns. Since Johnican's testimony at trial differed from his grand jury testimony, the State sought to examine him as a hostile witness and impeach him with his prior inconsistent statements. Defendants asserted that Johnican's grand jury testimony was involuntary. After a hearing conducted out of the presence of the jury, the trial court determined that Johnican's grand jury testimony was indeed voluntarily given. Thus, the State was permitted to impeach him with this testimony and the jury was permitted to consider this as substantive evidence pursuant to statute. Ill. Rev. Stat. 1985, ch. 38 , par. 115.10.0.

Johnican's grand jury testimony indicated that while at Woods' apartment, the group discussed the past murder of Tom Slick, who was Gross' friend. They started downstairs when police were seen, causing them to retreat to Woods' apartment. Then, they all went to Gross' mother's apartment and discussed shooting Vice Lords. Gross directed two of the group to retrieve the bag containing the guns from Woods' apartment. Afterwards, Gross distributed the guns.

While the group was at Gross' apartment, "Mookie" came to the door and told them the victim was coming. Atkins went to the far stairwell; the others went to the first stairwell. Troy Johnican and Gross were about to leave but Gross' mother called them back into the apartment. Shortly thereafter, they heard five shots. Gross ran downstairs, while Johnican remained in the apartment. Johnican waited about 20 minutes but no one returned. Then the police arrived.

Each of the defendants, who are brothers, presented an alibi defense. Mrs. Maryann Gross, the mother of both defendants and Marcia Harris, the sister of both defendants, each testified as alibi witnesses. Both women testified that Gross and Atkins were with the

family at their mother's apartment the entire evening. Neither Gross nor Atkins left the apartment when the shots were heard.

Defendant Atkins testified on his own behalf. He testified that he was at his mother's apartment with the family and did not leave. He was in the back room watching television at the time the shots were fired. He testified that he was never at Woods' apartment and did not see Troy Johnican that night. He also testified that neither Mahogany nor Woods was at his mother's home that evening and that he did not know them personally. Atkins recalled speaking with detectives on April 12, 1984, and telling them that he was at work during the evening of the shooting. He also recalled speaking with detectives and an assistant State's Attorney on April 13, 1984. He denied telling them, however, that he had lied the day before and denied that he identified anyone from any photographs. He also denied making a statement, initialling a written summary of an oral statement, and making a correction on a statement. The State was permitted to impeach Atkins with portions of his prior inconsistent statements. This was in accordance with a pretrial agreement that will be discussed later in this opinion.

Atkins testified that he was mistreated by detectives and did not speak with them of his own free will.

Detective Terrance Thedford testified for the State on rebuttal that he interviewed defendant Atkins on two separate occasions. During those interviews Atkins told him who was in his mother's apartment on the day of the shooting, gave a written statement, and initialed that statement. Detective Thedford denied any mistreatment of Atkins and testified that no threats or promises were made to the defendant.

Assistant State's Attorney George Vilcich also testified on rebuttal for the State. His testimony substantially corroborated Detective Thedford's rebuttal testimony.

Subsequently, the jury found defendants guilty of murder and conspiracy. During a hearing on post-trial motions, defendants' trial counsel, Mr. Dixon, sought and was granted leave to withdraw as counsel for defendant Atkins based on Atkins' allegation of incompetency of trial counsel. Atkins alleged ineffective assistance of counsel based on Mr. Dixon's failure to file a motion to quash his arrest and suppress statements.

Mr. Howard Savage filed his appearance on behalf of Atkins for purposes of post-trial motions and appeal. Subsequently, the court conducted a hearing on defendants' motions for a new trial based on newly discovered evidence. After hearing evidence, that motion was

denied. After the sentencing hearing defendants filed this appeal. For the following reasons, we affirm defendants' convictions for murder and vacate the convictions for conspiracy.

# I

First, defendants contend that they were denied their sixth amendment right to conflict-free competent representation of counsel because they were both represented by the same attorney at trial. Defendant Atkins also asserts a deprivation of his right to effective assistance of counsel premised on Mr. Dixon's "errors and omissions," specifically, his failure to move to quash his arrest and suppress his statements. The State responds that no deprivation of sixth amendment rights took place because their defenses were identical and not antagonistic, defendants suffered no prejudice by the joint representation, and each defendant knowingly and intelligently waived his right to object to any conflict of interest that may have been created by their joint representation at trial. Therefore, the first issue is whether defendants knowingly and intelligently waived any claims of prejudice constituting a denial of effective assistance of counsel due to a conflict of interest.

■■ ■ The right to effective assistance of counsel assured by the sixth amendment is indeed subject to waiver. (*People v. Washington* (1984), 101 Ill. 2d 104, 114, 461 N.E.2d 393, *cert. denied* (1984), 469 U.S. 1022, 83 L. Ed. 2d 367, 105 S. Ct. 442, citing *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708.) The determination of whether there has been an intelligent waiver of the right to conflict-free counsel depends upon the facts and circumstances of each case. *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1024; *People v. Washington* (1984), 101 Ill. 2d 104, 114, 461 N.E.2d 393, *cert. denied* (1984), 469 U.S. 1022, 83 L. Ed. 2d 367, 105 S. Ct. 442.

■ The record clearly demonstrates that both defendants waived any claims of prejudice as to their joint representation. In anticipation of a possible conflict of interest, the trial judge painstakingly advised the defendants of the problem and admonished them two times. The portions of the record reflecting the trial court's admonitions are too lengthy to reproduce in this opinion.

The first admonition took place prior to an agreement between the parties that conflicting portions of each of the defendants' statements would be redacted and therefore would not be before the jury. Following further pretrial matters, the court admonished defendants yet another time.

In sum, the trial court advised both defendants of: the potential of a conflict of interest; their rights to separate trials and separate counsel; their rights to a continuance if they desired new counsel; and the content and evidentiary value of their pretrial statements. The trial judge concluded that he would accept their waiver only if he found that each defendant clearly understood the consequences of a waiver and knowingly and intelligently waived his rights.

Each defendant insisted on proceeding with the trial with Mr. Dixon as his lawyer. The record amply supports the trial court's finding that each defendant knowingly and intelligently waived his right to a separate trial, a continuance of the trial to engage separate counsel, and his right to separate counsel. Thus, both defendants waived their rights to a claim of ineffective assistance of counsel due to joint representation.

 We next consider defendant Atkins' claim of ineffective assistance of counsel premised on Mr. Dixon's failure to move to quash his arrest and suppress his statements.

In order to prevail on an ineffective assistance claim, the defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 694, 80 L. Ed. 2d 674, 693-94, 697-98, 104 S. Ct. 2052, 2064-65, 2068.) There is a strong presumption that counsel's performance falls within the "wide range of professional assistance." (466 U.S. 668, 688, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.) The defendant bears the burden of proving that counsel's representation was unreasonable under current prevailing professional norms and that the acts complained of were not sound strategy. (466 U.S. 668, 688-89, 80 L. Ed. 2d 673, 693-95, 104 S. Ct. 2052, 2065.) On review, the determination of the reasonableness of trial counsel's actions must be evaluated from trial counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances. 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.

██ We are not persuaded that judged by an objective standard, defendant's counsel was incompetent or that without the alleged errors, the outcome of the trial would have been different. The record shows that trial counsel efficiently cross-examined the State's witnesses, presented witnesses on defendant's behalf, and rigorously argued defendant's case before the jury.

██ Moreover, counsel's failure to move to quash defendant's ar-

rest and suppress his statements did not result in ineffective assistance of counsel. It is well settled that "whether or not a motion to suppress should be filed in a criminal case is a matter of trial tactics and almost invariably has no bearing on the issue of competency of counsel." (*People v. Conley* (1983), 118 Ill. App. 3d 122, 129, 454 N.E.2d 1107.) A reviewing court will not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics or strategy. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270, *cert. denied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857.) Clearly, defendant has failed to meet the rigorous standard imposed by *Strickland*. Therefore, he was not deprived of his constitutional right to effective assistance of counsel.

## II

■■ Next, defendants argue that the court erroneously denied severance because their defenses were antagonistic. We disagree.

Generally, defendants jointly indicted are to be tried jointly unless fairness to one of the defendants requires a separate trial to avoid prejudice. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541, 468 N.E.2d 969.) There are two forms of prejudice that warrant severance. The first occurs when a codefendant makes a hearsay admission that implicates the defendant (a confrontation clause problem). (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The second type of prejudice occurs when the defenses are so antagonistic that a severance is imperative to assure a fair trial. *People v. Daugherty* (1984), 102 Ill. 2d 533, 542, 468 N.E.2d 969.

In the case at bar, each defendant made pretrial statements. Defendants' motions for severance were denied. The denial of separate trials was largely a result of an agreement reached between the parties. That agreement resulted in the redaction of portions of each of defendants' statements that implicated the other, *i.e.*, that each claimed he remained in the apartment while the others left. Any incriminating evidence concerning either Atkins or Gross was excluded from their statements.

Defendants presented identical alibi defenses, the gist of which was that they were both at their mother's apartment with other family members at the time of the shooting. The defense witnesses testified that each defendant was at their mother's apartment and remained there when they heard the shots. No facially incriminating confession exists in this case. The damning evidence came from the State's witnesses, not from a codefendant's testimony.

■■ Only defendant Atkins testified on his own behalf. All refer-

ences to Gross were excluded during his testimony and impeachment by the State. All of the evidence of defendants' involvement came from the State's witnesses. Since all references to Gross were excluded during Atkins' testimony, he did not implicate Gross. Accordingly, no violation of the confrontation clause occurred because the defendants' statements were redacted to eliminate not only the nontestifying codefendant's name, but any reference to his existence. Furthermore, a proper limiting instruction to the jury was given by the trial court. See *Richardson v. Marsh* (1987), 481 U.S. ___, 95 L. Ed. 2d 176, 107 S. Ct. 1702.

 Moreover, neither defendant was prejudiced by the joint trial because their defenses were not antagonistic. The test of whether a severance is necessary is not whether the codefendant explicitly names the defendant directly, but whether the incriminating implications of the codefendant's statements, viewed in the context of the State's other evidence, clearly point toward the defendant's guilt, or readily lead to an incriminating conclusion against the defendant. *People v. Jackson* (1986), 150 Ill. App. 3d 1, 5, 501 N.E.2d 802, *appeal denied* (1987), 114 Ill. 2d 542.

 In the case at bar, the evidence shows that defendants presented "common alibi defenses" which were not conflicting or antagonistic. Defendant Atkins' defense that he remained in his mother's apartment while he heard the gunshots was not antagonistic to defendant Gross' defense that he also remained in his mother's apartment while he heard the gunshots. Neither defendant admitted to actually shooting the victim, nor did one defendant implicate the other defendant as an actual participant in the fatal shooting. Thus, while the defense testimony was inconsistent with the State's case, the jury did not hear any evidence of antagonistic defenses. Therefore, denial of severance was proper and was not an abuse of discretion. See, *e.g.*, *People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.

III

 █ Next, defendant Atkins argues that the State failed to prove him guilty beyond a reasonable doubt, contending that the testimony of the State's witnesses was unreliable and incredible and therefore insufficient; the State failed to present any eyewitness testimony; and no weapons or fingerprints were recovered.

A court will not disturb a jury's verdict of guilt on review unless the evidence is so unreasonable, improbable or unsatisfactory to justify a reasonable doubt of defendants' guilt. (*People v. Lewis* (1981), 88 Ill. 2d 129, 151, 430 N.E.2d 1346, *cert. denied* (1982), 456 U.S.

1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307.) It is within the sole province of the jury to resolve factual disputes, judge the credibility of witnesses, and weigh the evidence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468, 447 N.E.2d 247, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 174, 104 S. Ct. 199.) A review of the record shows that the evidence was sufficient to justify defendant's conviction.

■■ Robert Ervin and Troy Johnican testified as accomplice witnesses. Whether their testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, within the province of the jury. *People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.

■■ In this case, Evans' and Johnican's testimony was strongly corroborated by the other evidence adduced at trial. The evidence showed that the defendants were present on the evening of the shooting with weapons, there was testimony of motive and intent to kill a "Vice Lord," and witnesses placed both defendants at Gross' apartment and in that building at the time of the shooting. While there was no eyewitness testimony, the corroborated evidence was sufficient. Thus, we believe that from the evidence presented, the jury could have properly concluded that defendants were guilty. We cannot say that this finding was so unsatisfactory or improbable as to raise a reasonable doubt of defendants' guilt.

## IV

■■ Next, defendant Gross contends that the trial court abused its discretion in instructing the jury as to the substantive use of Troy Johnican's grand jury testimony. He contends the instruction only highlighted prejudicial evidence and assumed controverted facts.

Trial courts have considerable discretion in deciding how to instruct the jury and whether to give a non-Illinois Pattern Jury Instructions (IPI) instruction. (*People v. Stamps* (1982), 108 Ill. App. 3d 280, 298, 438 N.E.2d 1282, *appeal denied* (1982), 91 Ill. 2d 564.) The following instruction was given over the defendant's objection:

> "The testimony of Troy Johnican made under oath at the grand jury on April 16, 1984, which was inconsistent with his testimony at trial may be considered by you as if it were made at this trial.
>
> You are the sole judges of the believability of the evidence and of the weight to be given to it."

■■ The record shows that Troy Johnican was called to testify by the State. His testimony at trial was inconsistent with his grand jury testimony. Subsequently it was determined that Johnican was indeed a

hostile witness and the State was permitted to impeach him with his contradictory grand jury testimony. Defense counsel objected alleging that Johnican's grand jury testimony was involuntary. After a hearing conducted outside the presence of the jury the court determined that Johnican's grand jury testimony was voluntary. As such, the inconsistent statements could be used by the State as substantive evidence pursuant to statute. Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1.

■■ While the instruction was a non-IPI instruction, it tracks the language of the statute, was supported by the evidence and accurately states the applicable law.

### V

■■ Finally, defendants contend, and the State concedes, that the convictions for conspiracy must be vacated as violative of the statutory prohibition against convictions for both an inchoate and a principal offense. Ill. Rev. Stat. 1985, ch. 38, par. 8—5; *People v. Walker* (1981), 84 Ill. 2d 512, 419 N.E.2d 1167.

■■ Accordingly, we vacate defendants' convictions for conspiracy and vacate the accompanying sentences of seven years on the conspiracy count as to each defendant. A remand for resentencing is not necessary, however. The sentences for murder were well within the court's discretion and are wholly supported by the facts of this case. There is no indication from the record that the conspiracy counts had any bearing on the defendants' sentences for murder. The trial court imposed separate concurrent terms for the separate convictions. *People v. Einstein* (1982), 106 Ill. App. 3d 526, 535, 435 N.E.2d 1257.

Therefore, the defendants' convictions for murder are affirmed and the defendants' convictions for conspiracy are vacated.

Affirmed in part; vacated in part.

SCARIANO, P.J., and STAMOS, J., concur.