THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIE B. CUNNINGHAM, Defendant-Appellant.

First District (3rd Division)   No. 87—1646

Opinion filed December 21, 1988.

Charisse A. Bruno, of Chicago, Alfred A. Levinson, of Park Ridge, and Mitchell F. Asher, of Palatine, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Kim A. Novi, Assistant State's Attorneys, of Chicago), for the People.

PRESIDING JUSTICE WHITE delivered the opinion of the court:

Following a jury trial, defendant, Willie B. Cunningham, was found guilty of voluntary manslaughter and sentenced to a prison term of seven years. On appeal, defendant contends that: (1) the State did not prove him guilty beyond a reasonable doubt; (2) he was deprived of a fair trial because the trial court, *sua sponte*, gave Illinois Pattern Jury Instructions, Criminal, No. 2.04 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 2.04) to the jury; (3) he was deprived of a fair trial because of prejudicial and inflammatory statements made by the State's Attorneys; and (4) he received an excessive sentence because the trial court believed that he should have been charged with murder instead of voluntary manslaughter. We affirm.

Following is a summary of the evidence adduced at trial.

James Baskin testified that, on December 16, 1985, he was employed as a bartender at Baby O's Lounge (the Lounge). The Lounge is

located at 1348 East 47th Street, Chicago, Illinois. At approximately 11:45 p.m., Mr. Baskin was standing in the center of the bar, waiting on patrons. He observed decedent, Danny Price, walking in the direction of the washroom, with defendant approximately 20 feet behind. A few seconds later, he heard a shot from the direction of the washroom. He looked toward the washroom and observed defendant walking from the direction of the washroom. Mr. Baskin testified that he first saw defendant when defendant was about 10 feet from the washroom. The washroom is 20 feet or more from the end of the bar. Three or four patrons were standing by the end of the bar. However, no other patron was in the area of the washroom. Defendant walked through the Lounge, exited the premises, and drove off in a grey Buick.

Mr. Baskin testified that there were about 25 to 30 patrons in the Lounge. He did not see whether decedent or defendant entered the washroom first. He also did not see whether defendant entered the grey Buick on the driver's side or on the passenger's side.

On cross-examination, Mr. Baskin testified that the washroom was only big enough to accommodate one person comfortably. At the time of the incident, he was engaged in a conversation with a patron at the bar. The tables and bar were full and there were patrons in all parts of the Lounge. Mr. Baskin also testified that he had never seen defendant argue with, or strike, anyone before.

On redirect examination, Mr. Baskin recalled testifying at a preliminary hearing on January 10, 1986, that decedent went into the washroom and defendant followed approximately 10 seconds later. However, he could not remember testifying at the hearing that decedent went into the washroom first and that both decedent and defendant entered the washroom. He also could not remember telling detective Leo Wolkosz that defendant entered the Buick by the passenger door and that a third person actually drove the car.

Betty Coleman testified that she was a very close friend of decedent. She was talking with decedent in the Lounge on December 16, 1985. At approximately 11:40 p.m., decedent told her that he was going to the washroom. Decedent walked toward the washroom, and she walked toward the front of the Lounge. She then heard a noise like a firecracker. Someone called decedent's name. She turned and walked toward the washroom. She saw defendant coming from the opposite direction. Defendant walked past her very fast and, as he did so, he removed his right hand from the left side of his jacket.

Michael Gerber, an assistant State's Attorney, testified that he interviewed defendant on December 18, 1985. He advised defendant of his constitutional rights and asked him if he understood his rights.

Defendant indicated that he did. Defendant then made an oral statement and signed a statement recorded by a court reporter.

Mr. Gerber was allowed to publish the statement recorded by the court reporter. In the statement, defendant said that he first saw decedent a week before the shooting. At that time, he had an argument with decedent outside the Lounge. Decedent approached him with a knife in hand and told him that "he was going to fuck [him] up." Defendant stepped away from decedent. Defendant did not hit decedent nor was he hit by decedent. Defendant stated that he had a second argument with decedent the Friday before the shooting. During the argument, decedent described to defendant what he was going to do to him. Decedent told defendant that he was not afraid of him. Defendant replied that he was not scared of decedent. Defendant then apologized to decedent and said that he was "through with it." Defendant stated that on the night of the shooting, he arrived at the Lounge between 5:30 p.m., and 6 p.m. He was talking with J.C. and watching a card game in the front of the Lounge when decedent approached them. Decedent told J.C. about the argument between decedent and defendant. Defendant told J.C. that he was through with the argument and he did not have anything against decedent. Decedent explained to J.C. what he was going to do to defendant. J.C. told decedent not to do anything to defendant and told defendant not to do anything to decedent. Decedent then walked away. Defendant stated that, later in the evening, he was using the urinal when decedent entered the washroom. Defendant was "kind of frightened." Decedent had his hand inside his pocket. He said to defendant that he was going to "fuck him up." Defendant whirled around, removed a .38 caliber revolver from the right side of his waistband, pointed the revolver at decedent, who was standing approximately one foot from defendant's left side, and shot decedent in the face. Defendant explained that decedent did not try to hit him or touch him. Defendant said that after the shooting, he was nervous and ran out of the Lounge.

Police officer Thomas Code testified that on December 16, 1985, at approximately 11:44 p.m., he responded to an assignment that a man had been shot in the Lounge. He arrived at the Lounge two to three minutes later. He was directed to the rear of the Lounge, where he observed a man lying on his left side on the floor, with his head facing the Lounge, and his feet inside the washroom. Officer Code protected the scene until the crime lab detectives and the coroner's office arrived.

On cross-examination, Officer Code testified that there were approximately 25 to 30 patrons in the Lounge. The washroom is about 10

to 15 feet from the back of the bar. There were stools at the back of the bar and tables to the right side of the end of the bar.

Dr. Joanne Richmond testified that she is employed by the Cook County medical examiner. She is a licensed physician and forensic pathologist. On December 17, 1985, she performed an autopsy on decedent. Her external examination of decedent revealed a bullet entry wound in the inner corner of decedent's right eye. Her internal examination revealed multiple fractures in the top and back of the skull. She observed a gunshot wound tract extending from the right side into the back of the left side of the brain. She recovered a deformed bullet and a smaller metallic fragment from the left side of the brain. In her opinion, decedent died of a gunshot wound to the head.

Dr. Richmond further testified that she performed certain tests to determine whether gunpowder was present on decedent's skin and the distance from which the bullet was fired. She found gunpowder and soot on decedent's skin. As a result of the tests, she concluded that the gun was one-quarter of an inch from the skin, if not in contact with the skin, when the bullet was fired.

On cross-examination, Dr. Richmond testified that she sent blood, urine and bile samples from the decedent to the lab for toxicological analysis. All three samples were positive for alcohol. Dr. Richmond also testified that the fractures observed in the skull were caused by the bullet.

Dorothy Spain, decedent's mother, testified that decedent lived in an apartment and worked on and off as a bellboy at the Pick Congress Hotel. Decedent had three children whom he took care of and supported the "best he could." She last saw decedent alive on December 12, 1985. She attended decedent's funeral on December 22, 1985.

Gregory Price, decedent's brother, testified that he last saw decedent alive on December 12, 1985. On December 17, 1985, he identified decedent at the morgue. He attended decedent's funeral on December 22, 1985.

Bill Jester testified for the defense. He is the foundation foreman for Osmond Construction Corporation in Arlington Heights. He hired defendant as a laborer approximately three years ago. Defendant then became his right-hand man. He was present on numerous occasions prior to December 16, 1985, when personnel discussed defendant and defendant's work. Defendant has a very good reputation for veracity, integrity and peacefulness in the workplace.

Detective Leo Wolkosz also testified for the defense. He arrived at the Lounge between 12:30 a.m. and 1 a.m. on December 17, 1985. He observed the physical layout of the Lounge. The distance from the cen-

ter of the bar to the washroom is approximately 45 to 50 feet. The distance from the end of the bar to the washroom is about 8 to 12 feet. The washroom is approximately six feet long and four feet wide. It contains a plastic trash container just inside the door, a wash basin and a toilet bowl. Two people can barely fit in the washroom. Detective Wolkosz also testified that he observed decedent lying on the floor. Decedent was on his left side, with his face down. His legs were inside the washroom, his hips were in the washroom doorway, and his torso was outside the washroom.

On cross-examination, Detective Wolkosz testified that the toilet bowl is against the wall of the washroom. Decedent's right foot was inside the washroom, between the toilet bowl and the west wall of the washroom. Decedent's right hand was inside the washroom, next to the trash container.

The State then called Lynn Thewis as a rebuttal witness. Ms. Thewis testified that she was the official court reporter at the preliminary hearing on January 10, 1986. She prepared a transcript of the hearing and certified that the transcript was true and correct. Ms. Thewis was then allowed to read part of Mr. Baskin's testimony at the hearing:

"[MR. BASKIN]: Well, about 11:45, I saw a young man by the name of Danny Price [decedent].

THE COURT: Danny who?

[MR. BASKIN]: Danny Price. He went to the washroom at that particular time. I didn't know his name. And then, later, Willie [defendant], he went to the washroom ten seconds later.

Q. Did they both go into the washroom.

A. They both went into the washroom.

Q. Who went in the washroom first?

A. Danny.

Q. Okay. And then, did Willie follow him in the washroom?

A. Right.

Q. Okay. And did the door close then?

A. The door closed automatically when you go in the washroom.

Q. Then, what happened?

A. About ten seconds later, I heard a shot.

Q. Where did that shot come from?

A. From the washroom."

The State also called Detective Wolkosz as a rebuttal witness. He testified that he and Detective Oster talked with Mr. Baskin on December 17, 1985. Mr. Baskin told them that, on December 16, 1985, decedent arrived at the Lounge at approximately 10 p.m. Decedent stayed

in the Lounge for some time and then left. Decedent returned to the Lounge a short time later and proceeded directly to the washroom. Defendant followed decedent into the washroom. The door to the washroom closed. Shortly thereafter, Mr. Baskin heard a shot. Defendant came out of the washroom and exited the Lounge. Defendant entered a 25 Electra Buick by the passenger door and drove away. Mr. Baskin believed that another person was in the car with defendant.

On cross-examination, Detective Wolkosz testified that Detective Oster prepared the police report regarding the interview with Mr. Baskin. Detective Wolkosz signed the report prepared by Detective Oster. The report states that, after the shooting, defendant walked out of the Lounge, entered a car and drove off. Detective Wolkosz testified, however, that Detective Oster took handwritten notes of the conversation. From his review of the handwritten notes, Detective Wolkosz could tell what type of automobile defendant used.

## I

■ We first address defendant's contention that he was not proven guilty of voluntary manslaughter beyond a reasonable doubt. In doing so, we note that it is the jury's responsibility to resolve any factual disputes, to assess the credibility of the witnesses, and to determine the sufficiency of the evidence for a verdict of guilt. (*People v. Bradford* (1985), 106 Ill. 2d 492, 502, 478 N.E.2d 1341; *People v. Atkins* (1987), 161 Ill. App. 3d 600, 611, 515 N.E.2d 272.) A reviewing court will not disturb a jury's verdict of guilt unless the evidence is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267; *People v. Atkins*, 161 Ill. App. 3d at 610; *People v. Lilly* (1985), 139 Ill. App. 3d 275, 281, 487 N.E.2d 414.) Moreover, once a defendant has been found guilty, judicial review of all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d at 261; *People v. Lilly*, 139 Ill. App. 3d at 281-82.

■ Applying these principles to the case at bar, we conclude that the jury's verdict was supported by the evidence. Defendant admitted that he pointed the gun at decedent's face and shot decedent. Thus, the only question that remained was whether defendant's actions were in self-defense. The jury heard the testimony of Mr. Baskin that he saw decedent walking toward the washroom, with defendant approximately 20 feet behind. A few seconds later, Mr. Baskin heard a shot coming from the washroom. He then saw defendant walking from the direction of the washroom. This testimony supported the jury's verdict

that defendant did not act in self-defense.[1] The physical evidence also supported the jury's verdict. Both Officer Code and Detective Wolkosz observed decedent lying on the ground with his head outside the washroom and his feet inside the washroom. Detective Wolkosz also testified that decedent's right foot was between the toilet bowl and the west wall of the washroom. Decedent's right hand was next to the trash container, just inside the washroom door. This evidence is consistent with a finding that decedent was in the washroom first and that he fell out of the washroom when he was shot.

We believe that the jury could have properly concluded that defendant was guilty of voluntary manslaughter. We cannot say that the evidence was so unsatisfactory or improbable as to raise a reasonable doubt of defendant's guilt and as to require us to substitute a different judgment.

## II

Next, defendant contends that he was deprived of a fair trial because the trial court, *sua sponte*, gave Illinois Pattern Jury Instructions, Criminal, No. 2.04 (2d ed. 1981) to the jury.[2] Defendant maintains that the instruction was a comment upon his right to remain silent.[3] In *Lakeside v. Oregon* (1978), 435 U.S. 333, 55 L. Ed. 2d 319, 98 S. Ct. 1091, the United States Supreme Court rejected a similar argument. There, the defendant argued that the trial court erred in instructing the jury, over the defendant's objection, that the defendant's failure to testify should not be considered in determining the question of guilt or innocence. The defendant maintained that "whatever beneficial effect such an instruction may have in most cases, it

---

[1]We note that Mr. Baskin's testimony at the preliminary hearing was even more damaging to defendant's claim that he acted in self-defense. There, Mr. Baskin testified that defendant followed decedent into the washroom. The door to the washroom closed. Seconds later, Mr. Baskin heard a shot coming from the washroom. The jury was entitled to consider Mr. Baskin's testimony as substantive evidence (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1), and the testimony provided additional support for the jury's finding that defendant was not acting in self-defense.

[2]The instruction given to the jury was as follows: "The fact that the defendant did not testify should not be considered by you in any way in arriving at your verdict."

[3]The State maintains that defendant waived this argument by failing to object to the instruction. We note, however, that the trial court gave IPI Criminal 2d No. 2.04 to the jury *sua sponte*. No reference was made to the instruction at the instruction conference. We agree with defendant that an objection made during jury instruction might have harmed defendant's case and defendant did not have a meaningful opportunity to object to the instruction. We also note that defendant raised the issue of the improper instruction in his motion for a new trial, thus giving the trial court an opportunity to review its holding.

may in some cases encourage the jury to draw adverse inferences from a defendant's silence, and, therefore, it cannot constitutionally be given in any case when a defendant objects to it." (425 U.S. at 339, 55 L. Ed. 2d at 325, 98 S. Ct. at 1095.) The Supreme Court observed that the defendant's argument "would require indulgence in two very doubtful assumptions: First, that the jurors have not noticed that the defendant did not testify and will not, therefore, draw adverse inferences on their own; second, that the jurors will totally disregard the instruction, and affirmatively give weight to what they have been told not to consider at all." (435 U.S. at 340, 55 L. Ed. 2d at 325, 98 S. Ct. at 1095.) The Supreme Court refused to accept these assumptions. Instead, it held that the giving of the instruction over the defendant's objection did not violate the privilege against compulsory self-incrimination guaranteed under the fifth and fourteenth amendments to the Constitution of the United States.

█ The United States Supreme Court's holding in *Lakeside* is dispositive of defendant's argument that he was deprived of a fair trial by the giving of IPI Criminal 2d No. 2.04. The Illinois courts have heretofore held that the provision of article 1, section 10, of the Illinois Constitution of 1970 and the provision of the fifth amendment to the Constitution of the United States "differ in semantics rather than in substance," and should be given the same construction. (*People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 160, 295 N.E.2d 472; *People v. Schmoll* (1979), 77 Ill. App. 3d 762, 764, 396 N.E.2d 634.) Decisions of the United States Supreme Court construing the fifth amendment are authoritative in construing the provision of article 1, section 10, of the Illinois Constitution. (*Halpin v. Scotti* (1953), 415 Ill. 104, 112 N.E.2d 91.) We are, therefore, compelled to hold that the giving of IPI Criminal 2d No. 2.04 did not violate defendant's right under the Illinois Constitution against self-incrimination or deprive defendant of a fair trial.

We are aware that some Illinois courts have held that "the choice of whether [IPI Criminal 2d No. 2.04] will be used is the defendant's and *** the giving of it over [the defendant's] objection is error." (*People v. Anderson* (1987), 153 Ill. App. 3d 542, 547, 505 N.E.2d 1303; *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328; *People v. Lee* (1976), 44 Ill. App. 3d 43, 357 N.E.2d 888.) These courts have stated that the "error" in giving the instruction requires reversal "[b]ecause of the constitutional implications." (*Anderson*, 153 Ill. App. 3d at 547.) However, none of these holdings reflect the decision in *Lakeside*. It would therefore be inappropriate to defer to these decisions.

## III

■ We next consider defendant's contention that various statements made by the State's Attorneys, and conduct of the State's Attorneys, deprived him of a fair trial. Initially, we note that defendant did not object to the majority of the statements at trial. Nor does his motion for a new trial address many of the alleged errors that he now complains of.[4] We believe that defendant has waived the alleged errors that he did not object to at trial or raise in his motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 185-90, 522 N.E.2d 1124; *People v. Young* (1985), 133 Ill. App. 3d 886, 893, 479 N.E.2d 494.) We also believe that review of these alleged errors is not required under the plain error doctrine because the evidence of defendant's guilt was overwhelming. (*People v. Enoch*, 122 Ill. 2d at 198-99.) Consequently, we examine only the statements made by the State's Attorneys and conduct of the State's Attorneys which were objected to at trial and raised in defendant's motion for a new trial.

■ During closing argument, the State's Attorney referred to the actions of defendant as those of an "executioner." Defendant asserts that these references were statements of fact which were not based upon the evidence. We disagree. The evidence showed that defendant followed decedent as decedent walked toward the washroom. The evidence also showed that defendant pointed a .38 caliber revolver at decedent's face and shot decedent in the eye from a distance of one-quarter of an inch or less. Consequently, we believe that the State's Attorney's remarks were supported by the evidence.

Even if we assume that the State's Attorney's remarks were error, we believe that the alleged error was cured by the trial court when it gave IPI Criminal No. 1.03 (Illinois Pattern Jury Instructions, Criminal, No. 1.03 (2d ed. 1981)), to the jury. The jury was instructed that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

■ Defendant also argues that the State's Attorney misstated the law of self-defense in closing argument. Defendant complains of the

---

[4]In his motion for a new trial, defendant averred that "[t]he prosecutors made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury and thereby prejudicing the Defendant's right to a fair trial." This general statement failed to preserve any alleged errors for review. In raising an objection, a defendant must be specific. He cannot merely allege, in boilerplate language, that a prosecutor made inflammatory or prejudicial remarks to the jury. *People v. Smith* (1985), 139 Ill. App. 3d 21, 27, 486 N.E.2d 1347; *People v. Young* (1985), 133 Ill. App. 3d 886, 893-94, 479 N.E.2d 494.

following remark:

> "And the reasonable person is the standard that we judge these by. What would a reasonable person similarly situated do under the circumstances."

Defendant objected to this remark at trial. The trial court immediately informed the jury that it would instruct the jury on the law. The trial court also instructed the jury that "[t]he law that applies to this case is stated in [the] instructions" that it gave the jury. Further, the trial court instructed the jury on the use of force in self-defense and defined the phrases "reasonable belief" and "reasonably believes." We believe that the trial court's instructions to the jury cured the error of which defendant complains.

Defendant asserts that the State's Attorney informed the jury that defendant had a duty to retreat, and, thus, misstated the law. The State's Attorney's comment was as follows:

> "There's a lot of questions you can ask yourself based on your common sense. Why didn't he just leave the washroom. Why didn't he just walk away."

We believe that the State's Attorney was commenting on the evidence and not stating the law. However, even if we assume that the comment was a statement of law, we do not believe that defendant was harmed thereby. The trial court informed the jury that it would advise the jury as to the law and instructed the jury to apply only the law stated in the instructions.

## IV

■ Lastly, we consider defendant's claim that the trial judge imposed an excessive sentence upon him because the judge believed that he should have been charged with murder instead of voluntary manslaughter. Defendant's claim is based upon the following remarks made by the trial judge at the sentencing hearing:

> "Now, maybe 'killed' isn't the right word. I think maybe, from the facts I heard, executed was the right word, by shooting him through the eye.
>
> You have led an exemplary life, Mr. Cunningham, up until that day on December 16, 1985. Taking into consideration that fact, that you have led an exemplary life and also taking into consideration the facts of this case which, as the State indicated or suggested, and in the Court's mind this wasn't a voluntary manslaughter, I won't say anything more than that, but it seems to me that maybe the indictment or the information was inartfully drafted. I am sentencing you sir, to the Illinois Department of

Corrections for a period of seven years."
There is a strong presumption that a judge's sentencing decision is based upon proper legal reasoning. (*People v. Goodman* (1983), 116 Ill. App. 3d 125, 451 N.E.2d 607.) We do not think that defendant has overcome this presumption. The trial judge knew that defendant was guilty of voluntary manslaughter, and not murder. The trial judge imposed a sentence of seven years' imprisonment, which was well within the range of 4 years to 15 years provided for voluntary manslaughter. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—2, 1005—8—1(a)(4).) The trial judge merely observed that the circumstances surrounding the shooting were such as to warrant a higher sentence within the range provided for voluntary manslaughter. We find no error or abuse of discretion in the trial judge's sentencing decision.

We have examined defendant's assertions of error. We conclude that defendant was properly convicted and sentenced. We therefore affirm the judgment of the circuit court of Cook County.

Affirmed.

McNAMARA and RIZZI, JJ., concur.